UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JEFFREY RANK and
NICOLE RANK

     Plaintiffs

v.                                    Civil Action No.: 2:04-0997

TOM HAMM and
CHRIS SMITH and
TIM M. JOHNSON and
SERGEANT H.E. SHAVER and
OFFICER G. SCOTT FERNATT and
TROOPER JOHN HAMILTON and
SERGEANT H.P. EPPERHART and
AARON SPORCK and
GREGORY J. JENKINS and
BARON BELL

     Defendants

<u>MEMORANDUM OPINION AND ORDER</u>

Pending are (1) plaintiffs' motion to amend the filing date of the third amended complaint ("motion to amend"), filed August 3, 2006, (2) separate motions to dismiss filed by defendants Chris Smith, Aaron Sporck, and Gregory Jenkins, all filed October 10, 2006, and (3) plaintiffs' motion to exceed the page limitation associated with their opposition briefs directed at the motions to dismiss filed by defendants Smith and Jenkins, filed November 9, 2006.

Regarding the motion to amend the filing date, plaintiffs request that the court deem the third amended

complaint to be filed on June 30, 2006, the date upon which leave
to amend was sought, rather than July 20, 2006, the date that
leave to amend was granted.  Inasmuch as no party has responded
to plaintiffs' motion to amend the filing date, the court ORDERS
that the third amended complaint be, and it hereby is, deemed
filed on June 30, 2006.

Regarding plaintiffs' motion to exceed the page
limitation, the court notes no objection by any of the
defendants.  Finding good cause, the court ORDERS that
plaintiffs' motion to exceed the page limitation be, and it
hereby is, granted.  It is further ORDERED that plaintiffs be,
and they hereby are, given leave to file briefs not to exceed 25
pages in opposition to Smith's and Jenkins' motions to dismiss.

I.

Plaintiffs Jeffery and Nicole Rank were West Virginia
residents at all material times.  (Compl. ¶ 4).  Defendants Tom
Hamm and Sporck were at all material times employees of
Congresswoman Shelley Moore Capito and serving as White House
Event Staff Members.  (Id. ¶ 5).  Defendant Chris Smith was at
all material times serving as a White House Event Staff Member,

2

although he asserts he was doing so in a volunteer capacity.
(Id. ¶ 6).  Defendant Gregory Jenkins was at all material times
the Director of the White House Office of Presidential Advance
("OPA") and a Deputy Assistant to George W. Bush, the President
of the United States.  (Id. ¶ 13).  The OPA is charged with
organizing and directing visits by the President of the United
States outside the White House complex in Washington D.C.  (Id.)

On Sunday, July 4, 2004, President Bush visited
Charleston and delivered a Fourth of July address on the grounds
of the state Capitol ("event").  (Id. ¶ 16).  This was an
official, taxpayer-funded appearance by the President.  (Id. ¶
16).  OPA is charged with designing and implementing the policies
and procedures governing admission requirements and
audience-member conduct at every public event at which the
President appears in his official capacity.  (Id. ¶ 16).  As OPA
Director, Jenkins establishes and is responsible for those
policies and procedures.  The policies and procedures were
implemented at the July 4, 2004, event.  (Id. ¶ 17).  By example,
those wishing to attend the event were required to have a ticket.

On July 3, 2004, plaintiffs obtained tickets to the
event through an email to Nicole Rank through her employer, the
Federal Emergency Management Agency ("FEMA").  (Id. ¶ 18).  Ms.

3

Rank received an additional email from a FEMA "Congressional
Liaison staff member" stating "there [wa]s no specified dress
code" for the event.  (Id.)  When Nicole Rank signed up for the
tickets, she was asked only for her name, address, and social
security number.  (Id.)  When her husband retrieved the tickets,
he was not asked any questions concerning his political
affiliation.  (Id.)

        The tickets stated that "patrons will be seated on a
first come, first served basis."  (Id. ¶ 19).  Neither the
tickets nor their distributors warned of consequences for those
critical of the President during the event.  (Id.)  On July 3,
2004, plaintiffs obtained copies of "The Visit of the President
to Charleston, West Virginia July 4, 2004 EVENT INFORMATION."
(Id. ¶ 20).  This document too lacked any mention of restrictions
of any kind on the location of persons who wished to exercise
their free speech rights in opposition to the President.  (Id. ¶
21).

        On the evening of July 3, 2004, defendant Baron Bell, a
paid employee or volunteer associated with the OPA, met with
several members of the White House Event Staff, including Sporck,
and instructed them concerning their responsibilities at the
event.  (Id. ¶ 22).  Bell told the White House Event Staff that

4

certain categories of expression were prohibited and that White House Event Staff were to order any audience member found displaying a prohibited message to cover it or leave the event. (Id.)

On the morning of July 4, 2004, Defendant H.P Epperhart, an officer with the West Virginia Department of Military Affairs and Public Safety ("Capitol Police"), met with local law enforcement officers and instructed them concerning their duties.  (Id. ¶ 23).  Epperhart told the officers that only White House Event Staff were authorized to revoke tickets, and that the officers were to follow the instructions of White House Event Staff in that regard.  (Id.)

After being admitted to the event, plaintiffs removed their outer shirts to display a message critical of the President.[1]  (Id. ¶ 25).   Hamm, Smith, and Sporck, wearing badges identifying them as "EVENT STAFF[,]" approached

---

[1]The front of both plaintiffs' t-shirts bore the international "no" symbol (a circle with a diagonal line across it) superimposed over the word "Bush."  (Id. ¶ 25).  Both t-shirts also displayed on the left sleeve a small photograph of President Bush with the international "no" symbol superimposed over it.  (Id.)  The right sleeve held a "Kerry" button.  (Id.) The message on the back of Nicole Rank's t-shirt was "Love America, Hate Bush."  (Id.)  On the back of Jeffery Rank's shirt was the message "Regime Change Starts at Home."  (Id.)

plaintiffs.  Plaintiffs allege the three defendants were then and there acting under the supervision of, and pursuant to, the instructions of Bell and Jenkins.  (Id. ¶ 26).

Hamm, Smith and/or Sporck told the plaintiffs they could not remain in attendance while wearing the t-shirts and directed them to remove or cover the items or leave the premises. (Id. ¶ 27).  Hamm, Smith and/or Sporck additionally ordered plaintiffs to remove or cover their t-shirts or to leave the Capitol grounds.  (Id.)

Johnson, an officer with the Capitol Police, Shaver, Fernatt, and Hamilton were instructed by the White House Event Staff to require plaintiffs to remove or cover their t-shirts or, if they refused, to arrest them and remove them from the Capitol grounds.  (Id. ¶ 28).  Johnson, Shaver, Fernatt, and Hamilton were also advised by White House Event Staff that plaintiffs' tickets had been revoked.  (Id.)  When plaintiffs refused to remove or cover their t-shirts,  Johnson, Shaver, Fernatt, and Hamilton arrested them, with Shaver and a police officer from the city of Charleston taking them into custody.  Plaintiffs were handcuffed, led from the Capitol grounds through a large crowd of people, jailed, and charged by local authorities with

6

trespassing.   (<u>Id.</u> ¶ 30).[2]  Johnson, Shaver, Fernatt, and
Hamilton complied with the orders in view of Epperhart's previous
instructions to them.   (<u>Id.</u> ¶ 28).

Plaintiffs allege that those permitted to remain at the
event included individuals wearing political paraphernalia
expressing support for the President and his policies.   (<u>Id.</u> ¶
31).  Plaintiffs additionally allege that similar, putatively
viewpoint-based removals have occurred throughout the country
over the past several years in, <u>inter alia</u>, LaCrosse, Wisconsin,
Denver, Colorado, Fargo, North Dakota, and Tucson, Arizona.   (<u>Id.</u>
¶ 32).

As noted, plaintiffs contend their expulsion came at
the direction of White House Event Staff pursuant to a national
policy established and disseminated by OPA, through its staff, at
the meeting held on the evening of July 3.   (<u>Id.</u> ¶ 33).   In

---

[2]Plaintiffs remained in custody for one to two hours.   (<u>Id.</u>
¶ 39).   During that time they were transported, presumably in a
police cruiser, to the Charleston Police Department, and they
remained handcuffed while they waited in a holding cell to be
booked, photographed, fingerprinted, and, finally, released.
(<u>Id.</u>)   The criminal charges against plaintiffs were subsequently
dismissed.   (<u>Id.</u> ¶ 40).   The Mayor and the City Council of
Charleston publicly apologized to the plaintiffs for having
participated in their arrest.   (<u>Id.</u> ¶ 41).   Nicole Rank, however,
was temporarily suspended from her FEMA position while the
charges were pending, resulting in lost income.   (<u>Id.</u>)

support, plaintiffs contend that Hamm has acknowledged the OPA policy guided his actions concerning plaintiffs on July 4, 2004, a policy he too contends has been in effect at other Presidential visits across the country.  (<u>Id.</u> ¶ 35).

Plaintiffs contend the OPA policy prohibits individuals at official Presidential events from displaying messages expressing disagreement with the President or his policies but permits display of messages expressing support for the President and/or his policies.  (<u>Id.</u> ¶ 36).  Alternatively, plaintiffs assert the OPA policy prohibits individuals at official Presidential events from displaying any "political paraphernalia."  (<u>Id.</u> ¶ 36).  The alternative allegation is based upon Hamm's and Sporck's description of the policy in these terms.  (<u>Id.</u>)  Plaintiffs contend both Hamm and Sporck suggest the policy would prohibit shirts such as plaintiffs' that mention a politician or party, but would not prohibit a shirt that says "I Support (or Oppose) Our Troops in Iraq."  (<u>Id.</u>)  Plaintiffs reaffirm that "[a]s head of OPA, Defendant Jenkins was responsible for the promulgation of the policy that was conveyed to Event Staff by Defendant Bell and pursuant to which White House Event Staff acted in triggering the arrest of the Plaintiffs and their removal from the event."  (<u>Id.</u> ¶ 38).

8

Plaintiffs instituted this action on September 14, 2004, naming Jenkins, W. Ralph Basham, the Director of the United States Secret Service, and four John Doe defendants.  On January 25, 2005, plaintiffs amended their complaint.  The amended complaint named Jenkins, Basham, Hamm, Smith, Johnson, Shaver, Fernatt, Hamilton, and Epperhart.  Summons was issued for Smith the same day.  On February 22, 2005, an order and notice issued. On March 28, 2005, Jenkins and Basham moved to stay discovery. On March 31, 2005, the parties' Rule 26(f) report was filed in advance of the April 15, 2005, scheduling conference.  On April 26, 2005, the case was stayed pending the resolution of motions to dismiss filed by Jenkins and Basham.

On February 28, 2006, the court denied the motion to dismiss.  Jenkins and Basham were, however, later voluntarily dismissed without prejudice (apparently in order to allow discovery to proceed) and, on March 10, 2006, plaintiffs filed a second amended complaint naming Hamm, Smith, Johnson, Shaver, Fernatt, Hamilton, and Epperhart.  On June 30, 2006, following a period for discovery, plaintiffs moved to amend the second amended complaint.  On July 20, 2006, the court granted the motion and directed that the third amended complaint be filed that same day.  The third amended complaint names Hamm, Smith, Johnson, Shaver, Fernatt, Hamilton, Epperhart, Sporck, Jenkins,

and Bell.

Plaintiffs state but a single claim, namely, that defendants' actions violated plaintiffs' First Amendment rights to peacefully assemble, speak, and petition for redress of grievances.  (Id. ¶ 44).  They seek (1) a declaration that defendants' actions violated the First and Fourteenth Amendments of the United States Constitution; (2) monetary damages for the constitutional violations and for emotional harm and lost income suffered as a result of the incident; and (3) attorney fees and costs.

Smith, Sporck, and Jenkins move to dismiss.  Smith contends he was not served within the time period allotted by Federal Rule of Civil Procedure 4(m).  Sporck contends (1) plaintiffs fail to allege he acted under color of state law, (2) a causal connection is lacking between his actions and the alleged deprivation, and (3) he is entitled to qualified immunity.  Jenkins contends (1) the court lacks personal jurisdiction over him, and (2) he is entitled to qualified immunity.

II.


A.   Defendant Smith's Motion to Dismiss


Smith contends he was not served with the third amended complaint until September 21, 2006, 605 days after filing of the amended complaint that first named him.[3]  Rule 4(m) provides as follows:

> (m) Time Limit for Service. If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period. This subdivision does not apply to service in a foreign country pursuant to subdivision (f) or (j)(1).

Fed. R. Civ. P. 4(m).  In <u>Mendez v. Elliot</u>, 45 F.3d 75, 79 (4th Cir. 1995), our court of appeals observed "Rule 4(m) requires that if the complaint is not served within 120 days after it is filed, the complaint must be dismissed absent a showing of good

---

[3]Plaintiffs concede the 120 day period properly commences not with the filing of the third amended complaint but rather with the filing of the January 25, 2005, amended complaint.

11

cause."[4]  Id.

In discharge of the good cause requirement, plaintiffs note that (1) when they named Smith as a defendant initially, they knew only that he was identified in police reports as White House Event Staff, (2) they lacked any information linking Smith to any employer, educational institution, or place of residence, (3) they initially checked local telephone directories and searched federal agency directories online, (4) they located a Christopher Smith on the White House staff, but he was not one and the same as the defendant Smith, (5) thereafter plaintiffs hired two private investigators as of December 22, 2004, to assist with the search for Smith, (6) neither investigator was able to locate Smith, as reflected in a letter from the later-retained investigator dated March 23, 2005, stating he had "exhausted every avenue to locate [Smith] based on the

---

[4]It is noted that the Supreme Court has more recently observed that "Rule 4(m) . . . permits a district court to enlarge the time for service 'even if there is no good cause shown.'" Henderson v. United States, 517 U.S. 654, 658 n. 5 (1996) (quoting Advisory Committee's Notes on 1993 Amendments to Fed. R. Civ. P. 4).  The statement in Henderson is dicta, and this court lacks authority to supplant Mendez with Henderson. See, e.g., Smith v. Moore, 137 F.3d 808, 821 (4th Cir. 1998) ("It is well established that a decision of this Court is binding on other panels unless it is overruled by a subsequent en banc opinion of the Court or an intervening decision of the United States Supreme Court.").

information available to" him,[5] (7) plaintiffs drafted interrogatories in February 2005 designed to elicit contact information for Smith from Hamm, (8) the interrogatories were not served inasmuch as discovery was stayed in the case for the period between April 28, 2005, to March 10, 2006, when plaintiffs filed their second amended complaint in compliance with the court's directions and, that same day, moved to conduct discovery prior to a new scheduling conference, (9) the court permitted discovery to commence on March 29, 2006, (10) on April 20, 2006, plaintiffs deposed Hamm and learned he was engaged to Krista Sheets, a former staff member in Representative Capito's office, (11) on June 15, 2006, Sporck confirmed this fact during his deposition and added that Smith lived in Arlington, Virginia, (12) plaintiffs retained a third private investigator, who reported on August 2, 2006, that he had located Smith in Arlington, and (13) on September 21, 2006, a third private investigator found Smith at his residence after multiple attempts by both the third private investigator and a professional process

---

[5]The investigator attested to the fact that he ascertained through Congresswoman Capito's office that the Chris Smith who volunteered for the event was a friend of a former employee of Representative Capito who may have worked at the State Department.  He additionally stated, however, that he "had no luck in locating this person either."  (Ex. 1 to ex. A, Pls.' Oppos. to Mot. to Dismiss).

server to perfect service.

The foregoing chronology indicates plaintiffs employed significant efforts to locate and obtain service upon Smith. Their efforts suggest, at a minimum, the exercise of the reasonable diligence necessary to benefit from the good cause proviso found in Rule 4(m). Having found good cause, the court extends the time for service to September 21, 2006. The court, accordingly, ORDERS that Smith's motion to dismiss be, and it hereby is, denied.[6]

B.   Defendant Sporck's Motion to Dismiss

Each of Sporck's three arguments in support of dismissal are discussed below.

---

[6]Smith additionally contends for the first time in reply that plaintiffs should have sought leave within the 120 day time frame, pursuant to Rule 6(b)(2), to obtain an extension of that period. Presumably Smith believes plaintiffs' belated request should not now be granted as they have not shown excusable neglect under Rule 6(b)(2) for having not earlier sought such an extension. The Rule 6(b)(2)/4(m) interplay posited by Smith represents the minority rule. See United States v. McLaughlin, 470 F.3d 698, 700 (7th Cir. 2006) (citing cases). To the extent Rule 6(b)(2) is applicable, it is important to note that the grounds plaintiffs would have advanced for an early extension in 2005 would have been the same as presented now, namely, the inability to locate Smith. It would appear both harsh and hyper-technical to deny an extension under such circumstances. The court concludes Smith's argument lacks merit.

14

## 1. Failure to Allege Sporck Acted
## Under Color of State Law

The color of law requirement found in section 1983 represents a deliberate choice by both Congress and the Third Branch to place some limit upon the reach of the civil rights statute:

> In the context of constitutional claims under 42 U.S.C. § 1983, which expressly applies to individuals acting "under color of" state law, courts have recognized the need to limit the liability of private persons through application of the "state action" doctrine. Under this doctrine, we "insist [ ]" as a prerequisite to liability "that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State." By doing so, we maintain the Bill of Rights as a shield that protects private citizens from the excesses of government, rather than a sword that they may use to impose liability upon one another. "Without a limit such as this," the constitutional order would be disrupted because "private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them."

Holly v. Scott, 434 F.3d 287, 291-92 (4th Cir. 2006) (citations omitted).

In order to satisfy the color of law requirement, the challenged deprivation "must [first] be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible . . . ."  Lugar v. Edmondson Oil Co., 457 U.S. 922,

15

937 (1982) (emphasis supplied).  Second, "the party charged with
the deprivation must be a person who may fairly be said to be a
state actor . . . because he is a state official, because <u>he has
acted together with or has obtained significant aid from state
officials</u>, or because his conduct is otherwise chargeable to the
State."  <u>Id.</u> (emphasis supplied).

          Satisfaction of the two-part test occurs when any one
of three categorical situations arise:

     A private entity regulated by the state acts under
     color of state law (1) when there is either a
     sufficiently close nexus, or joint action between the
     state and the private party; (2) when the state has,
     through extensive regulation, exercised coercive power
     over, or provided significant encouragement to, the
     private actor; or (3) when the function performed by
     the private party has traditionally been an exclusive
     public function.

<u>S.P. v. City of Takoma Park</u>, 134 F.3d 260, 269 (4th Cir. 1998).

Our court of appeals has also stated as follows:

     Applying the principles elucidated and refined by the
     Supreme Court, we have recognized four exclusive
     circumstances under which a private party can be deemed
     to be a state actor:

          (1) when the state has coerced the private
          actor to commit an act that would be
          unconstitutional if done by the state; (2)
          when the state has sought to evade a clear
          constitutional duty through delegation to a
          private actor; (3) when the state has
          delegated a traditionally and exclusively
          public function to a private actor; or (4)
          when the state has committed an

16

> unconstitutional act in the course of
> enforcing a right of a private citizen.

> Andrews v. Federal Home Loan Bank of Atlanta, 998 F.2d
> 214, 217 (4th Cir.1993). "If the conduct does not fall
> into one of these four categories, then the private
> conduct is not an action of the state." Id.

DeBauche v. Trani, 191 F.3d 499, 507-08 (4th Cir. 1999).

Sporck contends as follows in the memorandum supporting

his motion to dismiss:

> The Ranks knew at the time they filed their Third
> Amended Complaint that Mr. Sporck was, on the date of
> the incident giving rise to the putative claims against
> him . . . acting in the capacity of a volunteer
> assisting with logistics of [the event] . . . .
> Moreover, they were aware that he had no official role
> in organizing that event or establishing the policies
> governing attendance at that event and that he did not
> undertake any actions under color of either federal or
> state law that could reasonable [sic] serve as a basis
> for the assertion of claims against him . . . .

(Sporck's Memo. in Supp. at 2).  In sum, Sporck contends (1) he

was a volunteer at the event, (2) he played no role in

establishing the policy for the event, (3) he took no overt

action to enforce or have enforced the policy leading to

plaintiffs' ejection from the event, and (4) he simply "remind[ed

plaintiffs] . . . of the policy against political messages and

ask[ed] them to comply."  (Id. at 5).

The third amended complaint, however, contains the

following allegations:

17

12.   Defendant AARON SPORCK was, at the time of Plaintiffs'
      arrest, an employee in the congressional office of
      Congresswoman Shelley Moore Capito, and was serving as
      a White House Event Staff Member. . . .

      . . . .

26.   . . . . Defendants Hamm, Smith, and Sporck were
      wearing badges identifying them as "EVENT STAFF."  As
      White House Event Staff, Defendants Hamm, Smith, and
      Spork were acting under the supervision and pursuant to
      the instructions of Defendants Bell and Jenkins.

27.   Defendant Hamm, Defendant Smith and/or Defendant Sporck
      told Plaintiffs that they could not remain on the
      grounds while wearing their t-shirts.  Defendant Hamm,
      Defendant Smith and/or Defendant Sporck ordered
      Plaintiffs to remove or cover their t-shirts or to
      leave the Capitol grounds.

28.   Defendants Johnson, Shaver, Fernatt, and Hamilton were
      instructed by the White House Event Staff to require
      plaintiffs to remove or cover their t-shirts or, if
      they refused, to arrest them and remove them from the
      grounds of the Capitol.  Defendants Johnson, Shaver,
      Fernatt, and Hamilton were specifically informed by
      White House Event Staff that Plaintiffs' tickets had
      been revoked.

29.   Defendants Johnson, Shaver, Fernatt, and Hamilton
      complied with the orders of White House Event Staff
      because of Defendant Epperhart's previous instructions
      that White House Event Staff had the authority to
      revoke tickets and that no audience member was
      permitted to remain on the Capitol grounds during the
      event without a ticket.

(Third Am. Compl. ¶¶ 12, 26-29 (emphasis supplied)).[7]

_____

      [7]Sporck bases some of his factual assertions, contrary to
the third amended complaint, upon the pre-filing deposition
plaintiffs conducted upon him and others.  He contends reliance
upon the deposition testimony is appropriate because it is
                                        (continued...)

18

The foregoing allegations indicate that Sporck was a member of the White House Event Staff with authority granted by Epperhart to revoke tickets, leading to the expulsion of attendees from the event.  Additionally alleged in the alternative is the fact that Hamm, Smith, and/or Sporck instructed plaintiffs to remove or cover their shirts or face expulsion.  Plaintiffs then allege that White House Event Staff instructed law enforcement to require plaintiffs to comply or arrest and remove them from the event.  Indeed, the third amended complaint further alleges "Defendants had Plaintiffs arrested at a public event involving the President of the United States based on the content and viewpoint of Plaintiffs' speech."  (Third Am. Compl. ¶ 1)).  Based upon the instructions from Epperhart, law

---

[7](...continued)

"integral to and explicitly relied on in the complaint . . . ." (Sporck's Memo. in Supp. at 2 n. 2) (quoting American Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004)).  Sporck nowhere identifies, however, authority that would, in a Rule 12(b)(6) setting, permit use of deposition testimony to contradict the third amended complaint and result in dismissal.  Alternatively, if the deposition and other evidence developed to date was properly considered at this juncture, a choice between the competing versions would require a credibility determination, a type of finding that is expressly forbidden at the pretrial stage.  The fact that Sporck's argument might be construed as a Rule 12(b)(1) challenge is likewise of no moment. If Sporck's challenge to the third amended complaint is viewed as asserting plaintiffs' failure to allege facts upon which subject matter jurisdiction can be based, the plaintiff-friendly Rule 12(b)(6) standard yet applies.  Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).  Although some deposition references are favorable to Sporck's defensive theory, the incomplete discovery record provides no basis to sound the death knell for plaintiffs' claim at this juncture.

19

enforcement complied and arrested and ejected plaintiffs, after having been informed by White House Event Staff that plaintiffs' tickets were revoked.

The court notes the well-settled proposition that "section 1983 proscribes the 'misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Hughes v. Halifax County School Bd., 855 F.2d 183, 186 (4th Cir. 1988) (quoting Monroe v. Pape, 365 U.S. 167, 184 (1961)).  Inasmuch as the foregoing allegations set forth that Sporck was clothed with state authority based upon Epperhart's instructions, and (2) that he exercised that authority in a manner that apparently resulted in the alleged deprivation, plaintiffs have adequately alleged Sporck acted under color of state law.[8]  This ground for dismissal is not meritorious.

### 2.  Absence of a Causal Connection Between Sporck's Actions and the Deprivation and Qualified Immunity

---

[8]It seems apparent that discovery will more fully inform the proper resolution of this issue.  The court, accordingly, does not foreclose further examination of this or any other argument lodged by Sporck pursuant to Rule 56 after the close of discovery.

Sporck's causation and qualified immunity arguments
fail for similar reasons.  Regarding causation, Sporck contends
"nothing that . . . [he] did on the date in question had any
direct connection to the Ranks' claims of deprivation of
federally protected rights . . . ."  (Sporck's Memo. in Supp. at
12).  Regarding qualified immunity, Sporck contends the

> complaint alleges no more than that . . . [he] reminded
> the Ranks of a policy governing attendance at the event
> in question."  The mere act of communicating that
> policy, without more, cannot be said to be a violation
> of a constitutionally protected right, particularly
> when the person so communicating had not [sic] actual
> or apparent authority to take any action to enforce it
> and did not, according to the complaint, undertake to
> exercise any such authority.
>
> [N]o case has been found that even suggests, much less
> holds, that a person who advises someone that political
> signs and messages at an event of this nature are not
> permitted, is acting in violation of established
> constitutional rights."

(Id. at 14).  Sporck also contends he was merely a volunteer
entitled to rely upon others' formulation of a constitutional
policy for admission into the event.

Sporck's reading of the third amended complaint is
somewhat curious in view of plaintiffs' allegations concerning
his authority and the instructions he gave regarding plaintiffs.
Inasmuch as the third amended complaint alleges Sporck's personal
participation in plaintiffs' arrest and ejection from the event

21

arising out of the messages critical of the President that they
displayed on their clothing, Sporck's argument is not well taken.
 The allegations, fairly stated, are that Sporck, a volunteer
clothed with the authority of state law by Epperhart, ordered
police to arrest plaintiffs for displaying their critical message
when others displaying supportive messages were left alone.

        Taking account of both the causation standard and the
two-step process for qualified immunity, plaintiffs' allegations
are sufficient at this juncture to clear the bar.[9]  Leaving for
further development the nature of the forum and other potentially

_____

        [9]Sporck delayed until his reply brief to lodge an additional
qualified immunity argument.  Although the late argument lacks
clarity, Sporck appears to assert that it is uncertain whether
the event was a public forum, at which viewpoint discrimination
would be restricted.  The argument ignores the fact that
viewpoint discrimination is also forbidden in the non-public
forum setting.  See, e.g., Child Evangelism Fellowship of MD,
Inc. v. Montgomery County Public Schools, 457 F.3d 376, 381 (4th
Cir. 2006) ("The government may be more restrictive in its
regulation of speech in a nonpublic forum than in a traditional
public one.  In addition to the ability to enact content-neutral
time, place, and manner restrictions, the government may also
"reserve the [nonpublic] forum for its intended purposes,
communicative or otherwise, as long as the regulation on speech
is reasonable and not an effort to suppress expression merely
because public officials oppose the speaker's view."); Goulart v.
Meadows, 345 F.3d 239, 253-54 (4th Cir. 2003) (emphasis supplied)
(stating "And as with a nonpublic forum, 'the state's power to
restrict speech . . . [in a limited public forum] must not
discriminate against speech on the basis of viewpoint, and the
restriction must be reasonable in light of the purpose served by
the forum.'").

22

germane facts, it was abundantly clear at the time of the event that the First Amendment would not tolerate an individual, clothed with the authority of the state, commanding law enforcement to seize and expel a person from a public event based upon the content of that individual's speech. <u>See</u>, <u>e.g.</u>, <u>Columbia Union College v. Clarke</u>, 159 F.3d 151, 170 (4th Cir. 1998)("Government must not be permitted to silence one side of a debate . . . while permitting other more favored views to flourish unopposed.").

C.   Defendant Jenkins' Motion to Dismiss

     Jenkins challenges, pursuant to Federal Rule of Civil Procedure 12(b)(2), the exercise of personal jurisdiction over him.  Personal jurisdiction differs from subject-matter jurisdiction in that it reflects an individual liberty interest rather than an institutional interest. <u>Constantine v. Rectors and Visitors of George Mason University</u>, 411 F.3d 474, 480 (4th Cir. 2005); <u>see</u> <u>Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee</u>, 456 U.S. 694, 702 (1982) ("The requirement that a court have personal jurisdiction ···· represents a restriction on judicial power ··· as a matter of individual liberty.").

The proper resolution of a Rule 12(b)(2) motion involves somewhat unique procedural and substantive components. Our court of appeals has previously described the procedural component:

> When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff ultimately bears the burden of proving to the district court judge the existence of jurisdiction over the defendant by a preponderance of the evidence. Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). "But when, as here, the court addresses the question on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." Id.; see also In re Celotex Corp., 124 F.3d 619, 628 (4th Cir. 1997). Under such circumstances, courts "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Combs, 886 F.2d at 676.

New Wellington Financial Corp. v. Flagship Resort Development Corp., 416 F.3d 290, 294 (4th Cir. 2005); Mitrano v. Hawes, 377 F.3d 402, 407 (4th Cir. 2004); Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003).

It is noted, however, that "'[a] threshold prima facie finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence,

either at trial or at a pretrial evidentiary hearing.'"  New
Wellington, 416 F.3d at 294 n.5 (quoting Production Group Int'l
v. Goldman, 337 F. Supp.2d 788, 793 n. 2 (E.D. Va. 2004)
(citation omitted)).  As suggested by the foregoing quote, the
burden regarding personal jurisdiction never shifts to the
nonresident defendant.  See Young v. FDIC, 103 F.3d 1180, 1191
(4th Cir. 1997) ("The plaintiff, of course, has the burden to
establish that personal jurisdiction exists over the out-of-state
defendant."); ePlus Technology, Inc. v. Aboud, 313 F.3d 166, 176
(4th Cir. 2002) (same).

        Regarding the substantive component, one must
ordinarily clear two hurdles to establish personal jurisdiction.
First, plaintiff must identify, and bring the nonresident within,
the terms of an applicable state long arm statute, thereby
satisfying the requirement that personal jurisdiction receive the
sanction of the state sovereign in which the district court is
located.  See Fed. R. Civ. P. 4(k)(1)(A); Carefirst, 334 F.3d at
396; Young v. New Haven Advocate, 315 F.3d at 261; Ellicott Mach.
Corp. v. John Holland Party Ltd., 995 F.2d 474, 477 (4th Cir.
1993).  Second, plaintiff must demonstrate that the exercise of
personal jurisdiction would be consistent with due process.  See
Mitrano, 377 F.3d at 407; English & Smith v. Metzger, 901 F.2d
36, 38 (4th Cir. 1990).

Inasmuch as our court of appeals has held that the West Virginia long-arm statute is coextensive with the proper reach of due process, <u>In re Celotex Corp.</u>, 124 F.3d 619, 627 (4th Cir. 1997), the two-part inquiry merges into one, requiring only that the exercise of personal jurisdiction over the nonresident defendant will comport with due process.  That requirement is satisfied if the defendant can be said to have "minimum contacts" with the forum.  These contacts must be of a quality and quantum that requiring the nonresident party to defend its interests within the state would "not offend traditional notions of fair play and substantial justice." <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316  (1945) (internal quotation marks omitted); <u>Mitrano</u>, 377 F.3d at  407; <u>Carefirst</u>, 334 F.3d at 396.

In satisfaction of the requirement, "[a] defendant should be able to anticipate being sued in a court that can exercise personal jurisdiction over him; thus, to justify an exercise of jurisdiction, a defendant's actions must have been 'directed at the forum state in more than a random, fortuitous, or attenuated way.'" <u>Mitrano</u>, 377 F.3d at 407 (citing <u>ESAB Group, Inc. v. Centricut, Inc.</u>, 126 F.3d 617, 625 (4th Cir. 1997)); <u>ePlus</u>, 313 F.3d at 176.  Put another way, "there must 'be some act by which the defendant purposefully avails itself of the

26

privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Base Metal Trading, Ltd. v. OJSC Novokuznetsky Aluminum Factory, 283 F.3d 208, 213 (4th Cir. 2002) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-76 (1985).

The standard for determining whether a court may exercise personal jurisdiction over a nonresident defendant depends on whether that defendant's contacts with the forum state provide the basis for the suit. See Mitrano, 377 F.3d at 406-07; Carefirst, 334 F.3d at 397. If so, the court applies the standard for specific jurisdiction. If not, the rubric for general jurisdiction is employed. Our court of appeals has summarized the instances when specific and general jurisdiction may be appropriate:

> A court may exercise specific jurisdiction "[w]hen the cause of action arises out of the defendant's contacts with the forum." General jurisdiction is available if . . . [the defendant's] contacts . . . are "'continuous and systematic.'"

Saudi v. Northrop Grumman Corp., 427 F.3d 271, 276 (4th Cir. 2005). In determining whether specific jurisdiction exists, the court considers (1) the extent to which the defendant has purposefully availed himself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise

27

out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.  <u>Mitrano</u>, 377 F.3d at 407; <u>Carefirst</u>, 334 F.3d at 397; <u>ALS Scan, Inc. v. Digital Serv. Consultants, Inc.</u>, 293 F.3d 707, 712 (4th Cir. 2002) (alteration & internal quotation marks omitted).

The reasonableness inquiry is guided by additional factors, as noted by Judge Wilkinson in reliance upon settled precedent: "Overall, courts 'must consider[, <u>inter alia</u>,] [1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief' when determining whether the exercise of jurisdiction is reasonable in any given case." <u>Base Metal Trading, Ltd. v. OJSC Novokuznetsky Aluminum Factory</u>, 283 F.3d 208, 213-14 (4th Cir. 2002) (quoting <u>Asahi Metal Indus. Co. v. Superior Court</u>, 480 U.S. 102, 113 (1987); <u>Federal Ins. Co. v. Lake Shore, Inc.</u>, 886 F.2d 654, 661 (4th Cir. 1989).

In making its determination, the court does not simply engage in "contact counting":

> We should not "merely . . . count the contacts and quantitatively compare this case to other preceding cases." <u>Id.</u> Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of "fair play and substantial justice" is not thereby

offended.  Id. (citing Burger King Corp. v. Rudzewicz,
471 U.S. 462, 477-78, 105 S.Ct. 2174, 85 L.Ed.2d 528
(1985)); see McGee v. Int'l Life Ins. Co., 355 U.S.
220, 223-24, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

Carefirst, 334 F.3d at 397.

        More specifically, the situation in this action is one
that both the Supreme Court and our court of appeals have
confronted previously, namely, when "an out-of-state defendant
has acted outside of the forum in a manner that injures someone
residing in the forum."  Carefirst, 334 F.3d at 397.  The inquiry
in such a setting, an overlay of sorts upon the afore-referenced
three-part specific jurisdiction test, is summarized as follows:

        In Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79
        L.Ed.2d 804 (1984), the Supreme Court held that a court
        may exercise specific personal jurisdiction over a
        nonresident defendant acting outside of the forum when
        the defendant has intentionally directed his tortious
        conduct toward the forum state, knowing that that
        conduct would cause harm to a forum resident.  Applying
        that test to the libel suit before it, the Calder Court
        held that California possessed jurisdiction over
        Florida reporters who had written an allegedly libelous
        article for the National Enquirer about a California
        actress, because "California [was] the focal point both
        of the story and of the harm suffered." The writers'
        "actions were expressly aimed at California," the Court
        said, "[a]nd they knew that the brunt of [the
        potentially devastating] injury would be felt by [the
        actress] in the State in which she lives and works and
        in which the National Enquirer has its largest
        circulation." Id. at 789-90, 104 S. Ct. 1482; see also
        ESAB Group, 126 F.3d at 625-26 (emphasizing importance,
        in light of Calder, of evidence that defendant
        expressly aimed or directed its conduct toward forum
        state and noting that business activities focusing
        "generally on customers located throughout the United

> States and Canada without focusing on and targeting"
> forum state cannot yield personal jurisdiction).

Carefirst, 334 F.3d at 397-98 (some citations omitted).  At all
points, however, the touchstone of the inquiry focuses on the
defendant's contacts with the forum.  See ESAB, 126 F.3d at 626
(stating "[a]lthough the place that the plaintiff feels the
alleged injury is plainly relevant to the [jurisdictional]
inquiry, it must ultimately be accompanied by the defendant's own
[sufficient minimum] contacts with the state if jurisdiction ···
is to be upheld.") (quoted in New Haven Advocate, 315 F.3d at
262)).

Jenkins contends that plaintiffs have failed to allege
he maintained sufficient contacts with West Virginia to support
the exercise of personal jurisdiction.  Specifically, Jenkins
asserts, inter alia, that (1) he did not purposefully avail
himself of the privilege of conducting activities in West
Virginia, (2) he did not purposefully direct any activities at
West Virginia giving rise to the First Amendment claim, (3) it is
well settled that a position of authority in an organization is
insufficient to establish minimum contacts between the position
holder and all forums in which the organization has contacts, (4)
his formulation of a national policy that fortuitously resulted
in plaintiffs' deprivation locally does not satisfy the

requirement of purposeful availment, and (5) to compel high-ranking federal officials to defend against claims throughout the nation wherever federal employees enforce broadly applicable policies would eviscerate the minimum contacts doctrine in the constitutional tort context.

Plaintiffs appear to rely upon the doctrine of specific jurisdiction.  Regarding the first of the three governing factors for analyzing that jurisdictional hook, Jenkins does not appear to have done anything that one might characterize as purposefully availing himself of the privilege of conducting activities in West Virginia.  Indeed, he never (1) entered West Virginia, (2) sent conventional or electronic mail here, or (3) personally directed the activities of his agents in this state.  Plaintiffs contend purposeful availment is nevertheless present, asserting Jenkins (1) promulgated the nationwide policy that ultimately resulted in the deprivation, (2) his agents committed the deprivation, and (3) Calder teaches that jurisdiction is appropriate here.

Regarding the first contention, adoption of a nationwide policy does not of itself result in Jenkins purposefully directing personal activities toward West Virginia. Plaintiffs contend they are entitled to the benefit of that

31

putative "'reasonable factual inference[]'" but it is, instead, impermissible speculation.  A sitting President might never visit a particular state during his tenure.  Indeed, plaintiffs appear to concede as much.  (See Pls.' Memo. in Opp. at 11 (stating the policy would be enforced "in many states, including West Virginia[,] if and when the President made a public appearance there.") (emphasis supplied).  International Shoe and its progeny require more.[10]

Regarding the second contention, plaintiffs assert jurisdiction is appropriate based upon the acts of Jenkins' agents here.  They rely upon unpublished decisions and dicta in Aboud.  The non-resident defendant in that case, unlike Jenkins, had direct and substantial contacts with the forum:

> Aboud could reasonably have assumed, based on her contacts with the Commonwealth, that she would be sued there. She had submitted false information on credit applications to two Virginia companies, and she had provided false information to Dun & Bradstreet in connection with its Reports on MBT, intending for Virginia businesses to rely on this information. Considering these facts, Aboud knew or should have known that she could be sued in Virginia.

---

[10]The argument also appears to mix and match Jenkins' capacities depending upon the legal argument being made.  The third amended complaint alleges Jenkins is sued in his individual capacity.  (Third. Am. Compl. ¶ 13).  The instant argument, however, appears to attempt capture of Jenkins in an overarching, positional manner more akin to what one might expect in an official capacity suit.

Aboud, 313 F.3d at 177.  Aboud, like the unpublished and non-
precedential decisions cited by plaintiffs, is of no assistance.
Plaintiffs are charged with the burden of demonstrating to the
court from a factual and legal perspective that personal
jurisdiction by agency is appropriate.  They have not satisfied
their burden in that regard.

          Regarding plaintiffs' final argument relating to
Calder, as earlier noted, the Supreme Court held there that
California possessed jurisdiction over Florida reporters who had
written an allegedly libelous article for the National Enquirer
about a California actress.  In that decision, California, unlike
West Virginia here, "[was] the focal point both of the story and
of the harm suffered."  As recounted by our court of appeals, the
writers' "'actions were expressly aimed at California,'" and
"'they knew that the brunt of [the potentially devastating]
injury would be felt by [the actress] in the State in which she
lives and works and in which the National Enquirer has its
largest circulation.'"  Carefirst, 334 F.3d at 397-98 (some
citations omitted).  The distinctions between Calder and this
action are apparent.

          Moving to the second of the three specific jurisdiction
factors, inasmuch as Jenkins failed to purposefully undertake

jurisdiction-giving activities here, plaintiffs necessarily fail in their attempt to demonstrate that their claim arises from those absent activities.

Turning to the third and final question of whether the exercise of personal jurisdiction would be constitutionally reasonable, there is a significant burden imposed upon Jenkins if commanded to appear in this forum to defend.  On the other hand, West Virginia, like the plaintiffs, undoubtedly has an interest in redressing the alleged constitutional injuries here.[11]  The most troublesome consideration, however, remains: Jenkins' did not direct any actions toward this forum in any more than a "random, fortuitous, or attenuated way.'" Mitrano, 377 F.3d at 407 (citing ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 625 (4th Cir. 1997)); ePlus, 313 F.3d at 176.  Aside from authoring a policy governing the conduct of presidential visits to the several states, a policy that eventually resulted in plaintiffs' deprivation, one searches in vain for "'some act by which . . . [Jenkins] purposefully avail[ed] . . . [himself] of

_____

[11]Plaintiffs contend their interest is heightened because "if Jenkins is dismissed . . . a new lawsuit may be time-barred." (Pls.' Memo. in Opp. at 12).  It is unclear why plaintiffs did not long ago institute a protective action against Jenkins in his forum of residence.  In any event, neither this consideration nor judicial economy can supply Jenkins' otherwise non-existent contacts.

the privilege of conducting activities within . . . [West Virginia], thus invoking the benefits and protections of its laws.'" <u>Base Metal Trading</u>, 283 F.3d at 213 (quoting <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958); <u>ESAB</u>, 126 F.3d at 625 (""[t]he touchstone . . . remains that an out-of-state person have engaged in some activity purposefully directed toward the forum state.").

Inasmuch as the critical constitutional ingredient is lacking here, the exercise of personal jurisdiction over Jenkins would offend the first rule governing the inquiry, that a defendant not be haled into a jurisdiction where he has not purposefully availed himself of the privilege of conducting activities.  As noted by Jenkins, "[t]o compel high-ranking federal officials to defend against individual-capacity claims throughout the nation wherever federal employees enforce broadly applicable policies would eviscerate the minimum contacts doctrine in the constitutional tort context."  (Jenkins' Memo. in Supp. at 9).[12]

_____

[12]The court notes plaintiffs' additional contention that "It is . . . entirely possible that, through discovery, plaintiffs will be able to establish that Jenkins participated even more directly in plaintiffs' arrest than is alleged in the" third amended complaint."  (Memo. in Oppos. at 9 n.3).  That type of somewhat speculative forecast would ordinarily cause the court to pause, awaiting the fruits of discovery.  The court is not writing here on a clean slate, however, regarding the issue of Jenkins' amenability to suit in this forum.  One year ago, the
(continued...)

The court, accordingly, ORDERS that Jenkins' motion to dismiss be, and it hereby is, granted insofar as he asserts the lack of personal jurisdiction.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: March 21, 2007

John T. Copenhaver, Jr.
United States District Judge

---

[12](...continued)
court observed as follows:

> [T]he amended complaint is enigmatic. Coupled with the pleading's uncertain scope insofar as . . . Jenkins . . . [is] concerned is plaintiffs' professed willingness to amend the amended complaint to allege new facts. (Pl.'s Resp. at 2-3). This representation was then countered by the defendants, who accused plaintiffs of improperly attempting to amend their complaint with new, more specific allegations contained in the memorandum in opposition to the motion to dismiss. In view of these considerations, the better course is to permit plaintiffs an opportunity anew to plead every allegation that might aid the court's inquiry, and receive the defendants' response thereto, on the proper scope of the further amended complaint and the appropriate exercise of personal jurisdiction.

(Memo. Op. and Ord. (S.D. W. Va. Feb. 28, 2006) (emphasis supplied)).
    Following this observation, a six-month period of discovery ensued, during which time plaintiffs presumably did their level best to support the exercise of personal jurisdiction over Jenkins, culminating in the allegations against him in the third amended complaint. There is little utility in now permitting plaintiffs to remove the bottom of the barrel and speculate about what might exist beneath the floor upon which it sat.

36